# United States Court of Appeals
## For the First Circuit

No. 25-1297

NORBERTO LEONARDO ARGUETA CASTILLO,

Petitioner,

v.

TODD W. BLANCHE,[*] Acting Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Montecalvo, Lynch, and Dunlap,
Circuit Judges.

Kristian R. Meyer, Kevin P. MacMurray, and MacMurray &
Associates on brief for petitioner.

Monica M. Twombly, Trial Attorney, Office of Immigration
Litigation, U.S. Department of Justice, Brett A. Shumate,
Assistant Attorney General, and Gregory M. Kelch, Senior
Litigation Counsel, on brief for respondent.

May 27, 2026

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
Acting Attorney General Todd Blanche is automatically substituted
for former Attorney General Pamela J. Bondi as appellee.

**LYNCH**, **Circuit Judge**. Norberto Leonardo Argueta Castillo is a native and citizen of Guatemala who entered the United States at or near Houston, Texas, without inspection over twenty years ago. He petitions for review of a decision by the Board of Immigration Appeals ("BIA") dismissing his appeal from the Immigration Judge's ("IJ") denial of his application for cancellation of removal. See 8 U.S.C. § 1229b(b)(1)(D). He argues that the agency erred in finding that he was not entitled to cancellation of removal because his removal would not result in exceptional and extremely unusual hardship to his qualifying relatives: his two minor U.S. citizen daughters, ages seventeen and thirteen, the older of whom has anxiety and sleepwalks, and the younger of whom has eye conditions requiring corrective lenses. We deny the petition because, under the deferential review required by Wilkinson v. Garland, 601 U.S. 209 (2024), we find no reason to disturb the agency's well-supported hardship determination. As the agency found on the record evidence, Argueta Castillo's fears for his daughters, whom he testified would go with him on his removal, were not supported by medical evidence or by evidence that future medical treatment, if any were needed, would not be reasonably available in Guatemala. Indeed, the agency properly took account of evidence that contradicted his assertion of his fears about the future.

## I.

## A.

On May 14, 2018, the Department of Homeland Security filed a Notice to Appear charging Argueta Castillo with removability pursuant to § 212(a)(6)(A)(i) of the Immigration and Nationality Act. Argueta Castillo, through counsel, conceded that he was removable and filed an application for cancellation of removal based on the hardship his removal would allegedly cause his U.S. citizen daughters.[1] On September 3, 2019, he testified at a merits hearing before the IJ and also relied on his April 24, 2019, sworn affidavit and other documentary evidence previously submitted to the IJ.[2]

Argueta Castillo, found to be credible by the IJ, testified as follows. He was born in 1983 in San Marcos, Guatemala, and came to the United States in 2005 because Guatemala "is too insecure and [he] was rob[b]ed." At the time of the merits

---

[1] Argueta Castillo also applied for asylum and withholding of removal, but later withdrew those applications. In the alternative, he requested voluntary departure, which the IJ denied. Argueta Castillo did not appeal that denial to the BIA and does not attempt to argue the issue to us.

[2] Argueta Castillo submitted documents of identification for himself and his daughters; evidence of physical presence; medical records reflecting his daughters' diagnoses and treatment; informational resources about his daughters' medical conditions; materials bearing on the availability of mental health care and vision care in Guatemala; country conditions reports addressing human rights, healthcare, and economic conditions in Guatemala; and letters of support attesting to his good moral character.

hearing, he had been working in "house painting" for about twelve years. He had previously worked for a company called Presto Painting but had left and was then "working on [his] own."

Argueta Castillo lives with his two daughters and their mother, his girlfriend, who, like him, is a Guatemalan national without lawful status in the United States. If he is removed, he testified that he expects all three will accompany him to Guatemala. The older daughter, K.A., was born in September 2008, and the younger daughter, D.A., was born in March 2013. Both were born in Massachusetts and are U.S. citizens.

K.A. suffers from somnambulism ("sleepwalking"), which Argueta Castillo described as an "anxiety disorder." She cries in the middle of the night and walks while asleep, episodes which began when she was four years old and occur about three to four times a month. More than once K.A. has unlocked her bedroom door while sleepwalking and gone to the kitchen or to Argueta Castillo's room. Although K.A. has not left the apartment during any of those episodes,[3] Argueta Castillo fears that she might do so someday. K.A.'s therapist has told Argueta Castillo that K.A. "thinks a lot

--------

[3] Argueta Castillo's hearing testimony on this point differed from his sworn affidavit and from the memorandum he submitted to the IJ, both of which alleged that K.A. had on several occasions escaped the family home in the middle of the night while sleepwalking. In his brief to us, he says only that K.A. has gotten out of her locked bedroom during past sleepwalking episodes but does not say whether she has ever left the home.

about [his] [i]mmigration status," which causes her anxiety and sleepwalking. K.A. does not take any medication and sees a therapist twice a month, and Argueta Castillo intends for her to continue therapy until her conditions improve.

K.A.'s medical records reveal that her behavioral therapist, in a series of progress notes from late 2018 through early 2019, stated that K.A. had "worries about something happening to parents," but repeatedly observed that the anxiety "d[id] not appear to be affecting functioning." The therapist described K.A.'s symptoms as "stable," with "[n]o new stress," and said that she had made "great progress in therapy" and was doing well in school both "academically and socially." In late 2018, K.A.'s behavioral therapist contacted K.A.'s teacher and recorded that the teacher reported "no concerns" about K.A.'s "functioning in the classroom." The record also reflects that the parents had developed a system to keep K.A. safe at night during her sleepwalking episodes.

As to the younger daughter, D.A.'s medical records show that she failed a vision screening in 2017 and was diagnosed in early 2018 with amblyopia ("lazy eye") in the left eye and with hyperopic astigmatism ("farsightedness with astigmatism") in both eyes. Her treating provider instructed that she wear glasses "full time" and wrote that she would "likely always need corrective lenses." At a follow-up visit in April 2019, the provider

described D.A.'s vision as "stable" and recorded that she had been wearing her glasses only at school. The provider explained that amblyopia is "associated with a permanent reduction in vision" and stressed the importance of "full time spectacle correction." Argueta Castillo testified, based on his memory and without support in the medical records, that a doctor once told him that D.A. "could become blind" if her vision conditions were not treated. He also testified that D.A. needed to see a doctor every four months and responded in the affirmative when asked whether she can "see and function well in day-to-day life" when she wears her corrective lenses. The Mayo Clinic informational materials he submitted reported that untreated "[l]azy eye is the cause of permanent vision loss in 2.9 percent of adults." Those materials also described the ordinary symptoms of astigmatism as including blurred vision, headaches, and eyestrain, but did not list blindness as a risk or complication.

Argueta Castillo testified that his daughters would face exceptional and extremely unusual hardship if they relocated with him to Guatemala. He did not believe he could support his children there because Guatemala was "too insecure" and because, in his view, there was too little work even for people already living there. If removed, he "would have to look for some kind of work," though he did not know what kind. He had about $75,000 in savings, which he hoped to use to start a painting business, along with two

cars worth about $6,500 total and equipment valued at approximately $2,000. The girls' mother had worked in restaurants, earning between $250 and $300 a week.

Argueta Castillo submitted country conditions reports and other documentary evidence, which the agency took into account, in an attempt to demonstrate both that obtaining medical care for his daughters would be harder in Guatemala and that the family would face more difficult living conditions there. Those materials described limited access to specialized mental health care and eye care services in Guatemala, particularly outside Guatemala City, as well as low wages, corruption, and violence. At the same time, the materials reported that Guatemala's large cities have modern hospitals staffed by doctors across specialties, and that low cost or free vision services are available in some rural communities.[4]

---

[4] A mental health advocacy group's fact sheet described Guatemala's supply of mental health specialists as "very low" and estimated that there were only 0.54 psychiatrists per 100,000 inhabitants, with only five practicing outside Guatemala City. Another report stated that Guatemala City had eighty percent of the country's working doctors and that rural communities largely lacked accessible eye care services. That report also said that eye care services were expanding and that a nonprofit partner was providing low-cost and free vision services, school screenings, and community outreach in rural communities. A separate public health report described Guatemala's large cities as having modern hospitals with "well-trained and experienced doctors covering all different specialties" and a public health system with a "well-established legal framework" and "dedicated and experienced" workers. The U.S. State Department's 2018 Human Rights Report for Guatemala told of widespread corruption and impunity, trafficking in persons, and serious violence, while noting the Guatemalan

On May 4, 2020, the IJ issued a written decision denying Argueta Castillo's application for cancellation of removal and ordering him removed to Guatemala. The IJ stated that she had considered all testimony and documentary evidence and had assessed the asserted hardships in the aggregate. She concluded that Argueta Castillo had "failed to demonstrate the requisite exceptional and extremely unusual hardship to his two [U.S.] citizen daughters." The IJ found that neither daughter had a learning disability and that both were doing relatively well in school. The IJ also held that Argueta Castillo had not shown either that K.A.'s anxiety and sleepwalking or D.A.'s eye conditions were severe enough to constitute serious medical conditions, or that any needed treatment would be unavailable in Guatemala, especially given his $75,000 in savings. The IJ further found that it was speculative whether K.A.'s anxiety would even continue in Guatemala because her providers had tied it to the uncertainty of Argueta Castillo's removal proceedings and possible removal, and likewise speculative whether D.A. would go blind without further treatment. The IJ also reasoned that any risk

---

government's efforts to address femicide and violence against women. As to Guatemala's labor conditions, the U.S. State Department's report indicated that minimum wages "did not meet the minimum food budget for a family of five" and that noncompliance with wage laws was widespread in the informal sector, which employed seventy-four percent of the workforce.

posed by K.A.'s sleepwalking would be no greater in Guatemala than in the United States and could be mitigated through ordinary precautions. The IJ noted as well that Argueta Castillo had significant assets to help with relocation to Guatemala and that nothing in the record suggested that the girls' mother could not also work to support the family if needed. The IJ then concluded that Argueta Castillo had not shown that the children could not attend school in Guatemala or that any emotional or financial hardship, even considered cumulatively, was "substantially beyond that which would ordinarily be expected."

Argueta Castillo timely appealed to the BIA. On February 26, 2025, the BIA dismissed his appeal, affirming the IJ's hardship finding. The BIA held that the IJ had considered all relevant factors and applied the proper standard of proof. It then affirmed the IJ's determination that Argueta Castillo had not demonstrated the requisite educational, medical, or economic hardship to his daughters were they to accompany him to Guatemala and that those asserted hardships, considered cumulatively, did not amount to exceptional and extremely unusual hardship.

Argueta Castillo timely petitioned this court for review.

"Where, as here, the BIA adopts the IJ's decision but adds its own gloss, we review the decisions of both the BIA and the IJ together."  Maldonado-Ruiz v. Bondi, 169 F.4th 315, 322 (1st Cir. 2026) (quoting Martinez v. Bondi, 132 F.4th 74, 78 (1st Cir. 2025)).

Under Wilkinson v. Garland, 601 U.S. 209 (2024), we are precluded from reviewing "[t]he facts underlying any [agency] determination on cancellation of removal."  Id. at 225.  Our review is restricted to the agency's "application of the exceptional and extremely unusual hardship standard to a given set of facts."  Id. at 217.  And "[b]ecause this mixed question is primarily factual, that review is deferential."  Id. at 225.  The Court did not explain what it meant by "deferential."  Some circuits have used the "substantial evidence" standard, while one circuit to date has used the "clear error" standard.[5]  Our circuit has not decided the

---

[5]  The  Third,  Ninth,  and  Eleventh  Circuits  use  the "substantial evidence" standard of review.  See Wilkinson v. Att'y Gen., 131 F.4th 134, 140-42 (3d Cir. 2025); Gonzalez-Juarez v. Bondi, 137 F.4th 996, 1000-03 (9th Cir. 2025); Lopez-Martinez v. U.S. Att'y Gen., 149 F.4th 1202, 1206, 1208-10 (11th Cir. 2025). The Second Circuit has rejected "substantial evidence" review and instead utilizes "clear error" review.  See Toalombo Yanez v. Bondi, 140 F.4th 35, 37, 42-44 (2d Cir. 2025).  Other circuits, like the First Circuit, have not seen the need to choose between the different standards.  See Cuenca-Arroyo v. Garland, 123 F.4th 781, 784 n.1 (5th Cir. 2024); Santos Mendoza v. Bondi, 151 F.4th

question,[6] and we do not need to decide between these standards of review because we must reject Argueta Castillo's petition under any articulation.

To be statutorily eligible for cancellation of removal, Argueta Castillo must establish, among other things, that his "removal would result in exceptional and extremely unusual hardship to [his] spouse, parent, or child, who is a citizen of the United States."[7]   8 U.S.C. § 1229b(b)(1)(D).  This requires him to demonstrate that his qualifying relatives "would suffer hardship that is substantially different from, or beyond, that which would normally be expected from the deportation of [a noncitizen] with close family members" in the United States.  Cano v. Bondi, 152 F.4th 237, 245 (1st Cir. 2025) (alteration in original) (quoting Tacuri-Tacuri v. Garland, 998 F.3d 466, 472 (1st Cir. 2021)).  While Argueta Castillo "need not show that the

_____

900, 905 (7th Cir. 2025); Cortes v. Garland, 105 F.4th 124, 133-34 (4th Cir. 2024); Moctezuma-Reyes v. Garland, 124 F.4th 416, 423 (6th Cir. 2024); Gonzalez-Rivas v. Garland, 109 F.4th 1010, 1012 (8th Cir. 2024); Martinez v. Garland, 98 F.4th 1018, 1021 (10th Cir. 2024).

[6] See Cano v. Bondi, 152 F.4th 237, 244 (1st Cir. 2025); Leao v. Bondi, 144 F.4th 43, 52 (1st Cir. 2025); Samayoa v. Bondi, 146 F.4th 128, 136 n.4 (1st Cir. 2025); Nolasco v. Bondi, 134 F.4th 677, 682 (1st Cir. 2025); Trejo v. Bondi, 152 F.4th 248, 255 (1st Cir. 2025).

[7] The remaining statutory eligibility requirements for cancellation of removal are not at issue here.  See 8 U.S.C. § 1229b(b)(1)(A)-(C) (requiring continuous physical presence, good moral character, and no convictions of specified offenses).

hardship would be unconscionable," he faces "a high burden intended to cover truly exceptional situations."  Samayoa v. Bondi, 146 F.4th 128, 140 (1st Cir. 2025) (internal quotation marks omitted) (second quoting In re Monreal-Aguinaga ("Monreal"), 23 I. & N. Dec. 56, 62 (BIA 2001)).  "In evaluating whether a petitioner has met h[is] burden of proof, the agency should consider 'the age, health, and circumstances of the qualifying family members, including how a lower standard of living or adverse country conditions in the country of return might affect those relatives.'" Cano, 152 F.4th at 245 (quoting In re Gonzalez Recinas, 23 I. & N. Dec. 467, 468 (BIA 2002)).  "Notably, the agency must consider the relevant factors 'in the aggregate.'"  Id. (quoting Monreal, 23 I. & N. Dec. at 64).  "While an applicant's child's poor health is a compelling factor, the applicant must further establish that the relative has a serious medical condition and, if he or she is accompanying the applicant to the country of removal, that adequate medical care for the claimed condition is not reasonably available in that country."  Tacuri-Tacuri, 998 F.3d at 473 (citations and internal quotation marks omitted), abrogation on other grounds recognized by Figueroa v. Garland, 119 F.4th 160, 165 (1st Cir. 2024).

**B.**

Argueta Castillo makes three arguments on appeal.  He contends that the BIA departed from its settled course of

adjudication when it failed to correct the IJ's alleged failure to consider all relevant hardship evidence and that this asserted error is reviewable as a question of law. He next argues, on the same basis, that the IJ's decision is not sufficiently reasoned. And he asserts that removal plainly would impose on his daughters aggregate hardship that goes substantially beyond what ordinarily follows from a parent's removal. He seeks a remand for a new hardship determination. We hold that the IJ and the BIA holdings are not based on any error of law, are not clearly erroneous, and are supported by substantial evidence.

Argueta Castillo's first two arguments fail together. This is not a case in which the agency "'turn[ed] a blind eye to salient facts' or 'completely overlook[ed] critical evidence.'" Contreras v. Bondi, 134 F.4th 12, 20 (1st Cir. 2025) (quoting Diaz-Valdez v. Garland, 122 F.4th 436, 446 (1st Cir. 2024)). The IJ flatly stated that she had considered all testimony and documentary evidence and had assessed hardship in the aggregate. She then gave cogent reasons for concluding that Argueta Castillo had not shown that his removal would result in "exceptional and extremely unusual" hardship to his two U.S. citizen daughters. The BIA, in turn, held that the IJ had "considered all relevant factors and applied the proper standard of proof." Indeed, the agency's decisions expressly addressed the very categories of evidence Argueta Castillo says were ignored: the girls' schooling

- 13 -

and medical conditions, the availability of medical care in Guatemala, the country conditions reports, the family's finances and relocation prospects, and the cumulative effect of those asserted hardships. The BIA also addressed directly his argument that mental health services in Guatemala were limited, explaining that even if such care were lower in quality and less accessible than in the United States, he still had not shown that adequate treatment would not be reasonably available to K.A., especially absent evidence that the family could not relocate to a large urban area like Guatemala City.[8] When, as here, the agency's "decision is neither inconsistent with [the evidence at issue] nor gives reason to believe the [agency] was unaware of it, we have no reason to doubt [it] considered the evidence." Trejo v. Bondi, 152 F.4th 248, 255 (1st Cir. 2025) (first alteration in original) (quoting Domingo-Mendez v. Garland, 47 F.4th 51, 58 (1st Cir. 2022)).

To the extent Argueta Castillo also faults the agency for not expressly discussing every additional circumstance he now identifies, that argument fails as a matter of law. He relies on the BIA's decision in Monreal, which lists eight factors that may be relevant to a hardship determination. 23 I. & N. Dec. at 63.

---

[8] Argueta Castillo separately argues that the BIA misstated the record in saying that the article on mental health care in Guatemala had not been submitted into evidence and was not before the IJ. Even if the BIA was mistaken on that point, it nonetheless went on to address the article's substance, as described above.

- 14 -

What Argueta Castillo fails to mention is that the IJ in fact recited those factors in her decision. And even if the agency did not explicitly address each Monreal factor, we have explained that Monreal "uses permissive language when discussing th[ose] factors" and does not require the agency to address every factor in every case. Leao v. Bondi, 144 F.4th 43, 54 (1st Cir. 2025). We have also held that the agency "need not provide commentary on each piece of evidence or 'dissect in minute detail every contention that a complaining party advances.'" Djokro v. Garland, 102 F.4th 39, 47 (1st Cir.) (quoting Xin Qiang Liu v. Lynch, 802 F.3d 69, 77 (1st Cir. 2015)), cert. denied, 145 S. Ct. 774 (2024). Certainly on this record, "[w]e cannot say the [a]gency turned a blind eye to the evidence available for its consideration, and therefore it did not commit legal error." Samayoa, 146 F.4th at 139.

Nor are we persuaded that the additional circumstances Argueta Castillo says the agency did not account for in assessing hardship -- his daughters' English fluency and lack of Spanish fluency, his family and community ties in the United States, his comparatively limited ties in Guatemala, and the absence of alternate immigration relief[9] -- undermine the agency's hardship

---

[9] Argueta Castillo also relies on an article addressing the mental health effects on children whose parents are deported. But the portions he invokes concern children separated from a deported parent or situations in which the parent-child relationship is not preserved. By contrast, he testified that he expects his daughters and their mother will accompany him to Guatemala if he is removed.

determination. That is especially so given the IJ's explicit consideration of some of those circumstances and the BIA's adoption of the IJ's decision, along with the agency's unreviewable factual findings on the other hardship factors. And as to his daughters' English fluency and lack of Spanish fluency in particular, he has not explained how that consideration would bolster his extraordinary hardship argument. As we have explained, we "cannot conclude it was legal error for the agency not to explicitly address" a petitioner's desired factors when he "ha[s] not explained how consideration of [those factors] would bolster [his] hardship claim." Leao, 144 F.4th at 54 (first and third alterations in original) (quoting Nolasco v. Bondi, 134 F.4th 677, 685 (1st Cir. 2025)).

That leaves only Argueta Castillo's contention that the agency erred in concluding that the aggregate hardship to his daughters did not go substantially beyond what ordinarily follows from a parent's removal. This argument is meritless. Under Wilkinson, we cannot disturb the agency's factual findings that Argueta Castillo had failed to show (1) that his daughters had serious medical conditions, and (2) that adequate medical care for his daughters would be unavailable in Guatemala. See 601 U.S. at 222; see also In re J-J-G-, 27 I. & N. Dec. 808, 811 (BIA 2020). We may review only "the determination on the impact of removal -- as a legal question -- to ensure the [a]gency properly

considered the relevant record evidence as required under the legal standard set forth in" Monreal, 23 I. & N. Dec. at 63, and In re J-J-G-, 27 I. & N. Dec. at 811.  Samayoa, 146 F.4th at 138.  The agency did so here, properly considering the relevant evidence before it.  For example, K.A.'s treatment notes stated that she had made "great progress" in therapy and was doing well both "academically and socially."  D.A.'s eye conditions were being treated with corrective lenses, and her vision was stable.  Argueta Castillo's own testimony that he had savings and other assets and that the girls' mother was capable of working undercut the hardship argument.  In any event, reduced income is an ordinary consequence of removal rather than exceptional.  See id. at 141.

The petition for review is **denied**.